## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Candise Gore, | Case No. 2:22-cv-2322-RMG |
| Plaintiff, | |
| v. | **ORDER AND OPINION** |
| Dorchester County Sheriff's Office, Carol Brown, Kiesha Baldwin, Sheriff L.C. Knight, Richard Darling, Sharon Branch, and Wanda Taylor, | |
| Defendants. | |

This matter is before the Court on the Magistrate Judge's Report and Recommendation ("R & R"), recommending the Court grant Defendants' motions for summary judgment and remand Plaintiff's remaining state law claims to state court. (Dkt. No. 93). Plaintiff objected to the portions of the R & R recommending the Court grant Defendants' motions for summary judgment. (Dkt. No. 95). Defendants objected to the portion of the R & R recommending the Court remand Plaintiff's remaining state law claims to state court. (Dkt. No. 94). Defendants also replied to Plaintiff's objections. (Dkt. No. 96). For the reasons set forth below, the Court adopts the R & R as the order of the Court.

## I.    Summary of Facts

Plaintiff Candise Gore was arrested for domestic violence and transferred to the Dorchester County Detention Center for booking. (Dkt. No. 1-1, ¶ 11). The domestic violence charge did not involve weapons or drugs. (*Id.*) Upon arrival at the detention center, Plaintiff was allowed to stay in her own clothes while she sat on a bench, handcuffed, for more than thirty minutes. (Dkt. No. 81 at 5-6). She was not searched at that time. (*Id.*)

1

Later, Plaintiff was placed in a holding cell where she was subjected to a search by Defendant Carol Brown, a detention center officer. (*Id.* at 6). The search involved the removal of the Plaintiff's clothing, during which Defendant Brown observed a tampon string protruding from the Plaintiff's vagina. (Dkt. No. 81-1 at 30-33). Defendant Brown instructed the Plaintiff to remove the tampon in the officer's presence, which the Plaintiff did while seated on an exposed toilet in the holding cell. (*Id.*) After Plaintiff discarded the tampon, Defendant Brown subjected Plaintiff to a cavity search by asking Plaintiff to bend over and spread her buttocks and told to squat and cough. (*Id.*) Plaintiff complied, and the search concluded. (*Id.*)

After the search, Plaintiff put her clothes back on and was taken to another holding cell with two other arrestees, where she awaited her bond hearing. (Dkt. No. 81 at 8). Plaintiff never entered the general population area of the jail and was released on her own recognizance bond several hours later. (*Id.*)

The Plaintiff contends that this search was conducted in an unreasonably intrusive manner that violated her Constitutional rights. (Dkt. No. 1 at 6-10). She argues that the search was not justified, given that she was not entering the general population of the jail and that there was no individualized suspicion that she was concealing contraband. (Dkt. No. 81 at 10-16). After an earlier motion to dismiss, Plaintiff's only remaining claims are as follows: (1) a claim against Defendants Brown and Baldwin pursuant to 42 U.S.C. § 1983 for violations of Plaintiff's Fourth, Eighth, and Fourteenth Amendment rights; (2) a claim against Defendants Brown and Baldwin pursuant to 42 U.S.C. § 1983 for violations of Plaintiff's equal protection rights; (3) a claim against the Dorchester County Sheriff's Office ("DCSO") for negligence and gross negligence pursuant to the South Carolina Tort Claims Act; (4) a claim against Defendants Knight, Darling, Branch, and Taylor pursuant to 42 U.S.C. § 1983 for supervisory liability for equal protection and due

2

process violations; and (5) a claim against DCSO for reckless infliction of emotional distress, pursuant to the South Carolina Tort Claims Act. (Dkt. No. 57 at 5).

Defendants Brown and Baldwin moved for summary judgment on all claims against them; Defendants Branch, Darling, Knight, and Taylor moved for summary judgment on Plaintiff's supervisory liability claim against them; and Defendant DCSO moved for summary judgment on Plaintiff's South Carolina state law claims. (Dkt. Nos. 78, 79, and 80).

The Magistrate Judge issued an R & R recommending this Court grant Defendant Brown and Baldwin's motion for summary judgment and grant Defendant Taylor, Branch, Knight, and Darling's motion for summary judgment, dismissing those six individual Defendants from the case with prejudice. (Dkt. No. 93 at 43-44). The Magistrate Judge also recommended that the Court decline to exercise supplemental jurisdiction over Plaintiff's sate law claims and remand this action against DCSO. (*Id.*) Plaintiff objected to the portions of the R & R recommending the Court grant Defendants' motions for summary judgment. (Dkt. No. 95). Defendants objected to the portion of the R & R recommending the Court remand Plaintiff's remaining state law claims to state court. (Dkt. No. 94). Defendants also replied to Plaintiff's objections. (Dkt. No. 96). The matter is now ripe for the Court's review.

## II.  Standard

### A.  Report and Recommendation

The Magistrate Judge makes only a recommendation to this Court. The recommendation has no presumptive weight, and the responsibility to make a final determination remains with the Court. *Mathews v. Weber*, 423 U.S. 261, 270–71 (1976). The Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1). This Court is charged with making a de novo determination of those portions of the R

& R or specified proposed findings or recommendations to which objection is made. *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 315 (4th Cir.2005) (quoting 28 U.S.C. § 636(b)(1)); *accord* Fed. R. Civ, P. 72(b).

However, as to portions of the R & R to which no objection is made, this Court "must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond*, 416 F.3d at 315 (quoting Fed. R. Civ. P 72 advisory committee note). Additionally, the Court need not give any explanation for adopting the R & R in the absence of specific objections by the parties. *See Camby v. Davis*, 718 F.2d 198, 200 (4th Cir. 1983) ("Absent objection, we do not believe that any explanation need be given for adopting the report.").

### B. Summary Judgment

Summary judgment is appropriate if a party "shows that there is no genuine dispute as to any material fact" and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In other words, summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Props.,* 810 F.2d 1282, 1286 (4th Cir. 1987). "In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities in favor of the nonmoving party." *HealthSouth Rehab. Hosp. v. Am. Nat'l Red Cross,* 101 F.3d 1005, 1008 (4th Cir. 1996). The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. *Id.* at 324. Rather, the non-moving party must demonstrate that specific, material facts exist that

4

give rise to a genuine issue. *Id.* Under this standard, "[c]onclusory or speculative allegations do not suffice, nor does a 'mere scintilla of evidence'" in support of the non-moving party's case. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) (quoting *Phillips v. CSX Transp., Inc.,* 190 F.3d 285, 287 (4th Cir. 1999)).

III.  **Discussion**

   A.  **Motion filed by Defendants Brown and Baldwin**

Under 42 U.S.C. § 1983, Plaintiff claims that Defendants Brown and Baldwin violated her Fourth Amendment right to be free from unreasonable searches by subjecting her to the strip search and a body cavity search at the detention center. Plaintiff also claims that the strip search violated the Equal Protection Clause of the Fourteenth Amendment because she believes that the men are not routinely strip searched or forced to undergo visual or actual body cavity searches in the same manner that women are. Defendants Brown and Baldwin moved for summary judgment on both § 1983 claims.

To establish a § 1983 claim, Plaintiff must demonstrate Defendants, acting under color of state law, deprived her of a right secured by the Constitution or the laws of the United States. 42 U.S.C. § 1983.

The Magistrate Judge recommended granting Defendants Brown and Baldwin's motion for summary judgment on both claims. Specifically, the Magistrate Judge found that the evidence did not show that Defendants Brown and Baldwin violated Plaintiff's Fourth Amendment rights. The Magistrate Judge further found that, even if the evidence did show a Fourth Amendment violation, the Defendants were entitled to qualified immunity. The Magistrate Judge also found that evidence did not show that Defendants Brown and Baldwin violated Plaintiff's Eighth Amendment rights.

5

Plaintiff objected to the Magistrate Judge's findings. The Court therefore conducts a *de novo* review of Defendants' motion.

### 1. Defendant Brown's Alleged Fourth Amendment Violation

#### a. Fourth Amendment Analysis

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend IV. "The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." *Sims v. Labowitz*, 885 F.3d 254, 260-61 (4th Cir. 2018).

It is well established that "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of retrained constitutional rights of both convicted prisoners and pretrial detainees." *Bell v. Wolfish*, 441 U.S. 520, 546 (1979). To be sure, inmates "retain an interest in some degree of bodily privacy and integrity." *King v. Rubenstein*, 825 F.3d 206, 215 (4th Cir. 2016). But when addressing constitutional claims about searches in detention settings, "deference must be given to the officials in charge of the jail unless there is substantial evidence demonstrating their response to the situation is exaggerated. *Florence v. Bd. of Chosen Freeholders of Cnty. Of Burlington*, 566 U.S. 318, 330 (2012).

Second, it can hardly be questioned that sexually invasive searches of inmates present special considerations. This is because "a sexually invasive search constitutes an extreme intrusion upon personal privacy, as well as an offense to the dignity of the individual." *Sims*, 885 F.3d at 261 (cleaned up). When "a search involves movement of clothing to facilitate the visual inspection of a person's naked body, the search qualifies as a type of sexually invasive search." *Id.* (cleaned up). And "[w]hen the scope of a search exceeds a visual inspection of an individual's naked body, the magnitude of the intrusion is even greater." *Id.*

6

To determine whether a sexually invasive search was constitutionally unreasonable, we apply the balancing test adopted by the Supreme Court in *Bell.* "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." *Bell*, 441 U.S. at 559, 99 S.Ct. 1861. We must "examine the search in its complete context and consider the following factors: (1) the scope of the particular intrusion; (2) the manner in which the search was conducted; (3) the justification for initiating the search; and (4) the place in which the search was performed." *Sims*, 885 F.3d at 261 (citing *Bell*, 441 U.S. at 559, 99 S.Ct. 1861).

### i.    Scope of the Intrusion and Manner of the Search

The scope of the search and the manner in which it was performed may involve overlapping inquires and may be considered together. *Johnson v. Robinette*, 105 F.4th 99, 116-17 (4th Cir. 2024) (citing *Sims*, 885 F.3d at 261). The scope and manner of the intrusion of the visually body cavity inspection at issue is an important factor and must be considered with the other factors because an invasive search may be constitutionally permissible under certain conditions and constitutionally impermissible under others. *See, e.g.*, *Calloway v. Lokey*, 948 F.3d 194, 205 (4th Cir. 2020) (holding a strip and body cavity search of a prison visitor is reasonable when prison officials have "reasonable suspicion, based on particularized and individualized information, that such a search will uncover contraband on the visitor's person on that occasion").

Plaintiff argues that the scope and manner of the search was overly invasive because the search went beyond the surface of the Plaintiff's body into a sensitive private body part when she was directed to remove a tampon from her vagina with her legs spread naked while sitting on a toilet in front of an officer.

Additionally, Plaintiff argues that the scope and manner of her search was as severe and unreasonable as the searches conducted in *King v. Rubenstein*, 825 F.3d 206 (4th Cir. 2016), *Sims v. Labowtiz*, 885 F.3d 254 (4th Cir. 2018), and *Amaechi v. West*, 237 F.3d 356 (4th Cir. 2001). In *King*, where prison officials performed surgery on an inmate's penis to remove implanted marbles, the Fourth Circuit found the scope of the intrusion weighed in favor unreasonableness because "the surgery was beneath the skin into a sensitive, private body part," was not "commonplace," and "involved 'risk, trauma, and pain.'" 825 F.3d at 215. In *Sims*, where an officer "attempted to photograph Sims' penis in a sexually aroused state" and "order[ed] Sims to masturbate [in front of three armed officers] to obtain an erection," the Fourt Circuit found that the search was unreasonable and "exceptionally intrusive." 885 F.3d at 261. In *Amaechi*, where an officer "physically touched and penetrated [the arestee's] genitalia and kneaded her buttocks with his bare hand" in her front lawn, the Fourth Circuit found that the search was unreasonable and explained that "[p]ublic exposure of the genitalia accompanied by physical touching is far more intrusive than directing an arrestee to remove her clothing in private for the purpose of 'visually inspecting' the arrestee's genitalia." 237 F.3d at 363. Based on these cases, Plaintiff argues that the search here is unreasonable because *King* stands for the principle that a search involving physical penetration of genitalia weighs in favor of unreasonableness and because *Sims* stands for the principle that an intrusive search at the command of law enforcement weighs in favor of unreasonableness. (Dkt. No. 95 at 3).

The Magistrate Judge found that the scope and manner of the search here is more like the search conducted in *Calloway v. Lokey*. (Dkt. No. 93 at 17). In *Calloway*, two female officers strip searched a prison visitor in a woman's restroom. *Calloway*, 948 F.3d at 199. After the visitor removed all her clothes, "she complied with [the officer's] directions to lift her arms and breasts,

8

open her mouth, and lean over for hidden contraband. *Id.* At the officer's direction, the visitor "next went into the bathroom stall and removed her tampon, which [the officer] inspected before disposing of it." *Id.* The visitor "then twice performed the 'squat and cough' maneuver, and . . . she also spread her buttocks for the officers' inspection." *Id.* The Fourth Circuit found the search reasonable and held that even though prison visitors enjoy greater privacy interests than do prison inmates or pretrial detainees, security concerns in the prison context generally justify visual body cavity searches based on reasonable and individualized suspicion. *Id.* at 205. The Fourth Circuit cited the "prison's interest in preventing the introduction of drugs, weapons, and other contraband." *Id.*

Here, the evidence shows that Plaintiff's search is more like the search in *Calloway* than like the searches in *King*, *Sims*, and *Amaechi*. Plaintiff argues that she was forced to remove her tampon in front of Defendant Brown while the plaintiff in *Calloway* was afforded the privacy of a stall for the actual removal of her tampon. This distinction, however, does not make this case more like *King*, where there was physical intrusion by prison officials; *Sims*, where the inmate was forced to perform sexual acts; or *Amaechi*, where physical touching and penetration occurred in public. Moreover, the plaintiff in *Calloway* was ordered to place her used tampon in an officer's hand for inspection and plaintiff was not required to do that here. This fact shows that there is at least one invasive aspect of the search in *Calloway* that is not present here.

Even though the Court finds that Plaintiff's search is factually more like the search in *Calloway*, the Court sill finds that the manner and scope of the search was highly intrusive. This factor alone does not, however, render Plaintiff's search unconstitutional because the use of a highly invasive search is intertwined with the other factors in an overall reasonableness analysis.

### ii.     The Justification for Initiating the Search

"Correctional officials have a legitimate interest, indeed a responsibility, to ensure that jails are not made less secure by reason of what new detainees may carry in on their bodies. *Florence v. Board of Chosen Freeholders of County of Burlington*, 566 U.S. 318, 322 (2012). "Weapons, drugs, and alcohol all disrupt the safe operation of a jail," *id.* at 332, and the [s]muggling of money, drugs, weapons, and other contraband is all too common an occurrence," *Bell*, 441 U.S. at 559. Accordingly, "courts must defer to the judgment of correctional officials unless the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of jail security" *Florence*, 566 U.S. at 322-23.

Plaintiff argues that this factor weighs heavily in favor of unreasonableness because there was no particularized justification for the body cavity search, which, she argues, is always required for body cavity searches. (Dkt. No. 81 at 13-14). Plaintiff further contends that instead of being placed in a cell with two other women, she should have been housed in one of the two holding cells in the intake area (such as the one where the search took place) without undergoing a strip or body cavity search of any kind. (*Id.* at 15-16).

Defendant Brown did not initiate the search of Plaintiff based upon any reasonable suspicion or probable cause particular to Plaintiff. Rather, Plaintiff was searched pursuant to a detention center policy requiring that all person admitted to the facility be strip searched. Defendant Brown argues that the justification for initiating the search was to prevent contraband from entering the facility and putting its inmates at risk. (Dkt. No. 78-1 at 10). Defendant Brown notes that Plaintiff was searched before being placed into a holding cell that already held two other women and could hold several additional women and that Plaintiff was in there for several hours. (*Id.* at 11). Defendant Brown testified in her deposition that if an inmate has drugs on their person

10

and goes into a cell with other people without being properly searched it could be dangerous to other inmates. (Dkt. No. 78-7 at 53). Defendant Darling also testified in a deposition that it is dangerous to have multiple detainees in a cell together prior to them being strip searched because they could have weapons or drugs in their possession. (Dkt. No. 81-2 at 3-4).

There is evidence in the record suggesting that there have been times where detainees have been held in the intake area while awaiting a bond hearing, as opposed to being held in one of the holding cells in the secure area, in which case they would not be strip searched. (Dkt. No. 81-2 at 4-5). Defendant Darling testified, however, that at the time of Plaintiff's arrest the two intake holding cells could not be used to hold persons awaiting a bond because he did not have personnel to manage those cells due to COVID-related staffing shortages. (*Id.* at 7).

Plaintiff challenged Defendant Darling's assertion that the detention center did not have sufficient personnel to permit a pre-arraignment arrestee to be held alone in one of the two intake holding cells and points to video evidence of three employees in the intake area at the time of her intake. (Dkt. No. 81 at 6, 15).

As an initial matter, the Court, mindful of the deference to officials in charge of jails, hesitates to question the decision to place Plaintiff in a holding cell with two other women as opposed to being held by herself in one of the cells in the intake area. The record does not show substantial evidence that the decision was unnecessary or unjustified such that the Court should not defer to the officials regarding that decision.

As to Defendants' general justification of Plaintiff's strip and body cavity search, the Court finds that the search was justified because Plaintiff was detained for several hours in a cell with at least two other people before her bond hearing. The Court finds that the justification weighs in favor of reasonableness.

11

### iii.    The Location of the Search

"The question whether a sexually invasive search is conducted in a private or public setting is especially relevant to this Court's determination of reasonableness." *United States v. Edwards*, 666 F.3d 877, 883 (4th Cir. 2011). The Fourth Circuit has "repeatedly emphasized the necessity of conducting a strip search in private." *Id.* "While every strip search need not be conducted in a private holding cell to adequately safeguard [an inmate's] privacy interests, [courts] consider whether a sexually invasive search could have been viewed by others, and whether it was in fact viewed by others, in [their] analysis of the reasonableness of the search." *Id.* Courts also consider whether the search was viewed by members of the same or opposite sex. *Johnson*, 105 F.4th at 116 (finding that this factor weighed heavily in favor of reasonableness where "every strip search was conducted in the privacy of his cell, by a member of the same sex . . . , and outside the view of any other persons.").

Plaintiff argues that the location of the search was unreasonable because on the door of the cell she was searched in there was a window with a shade accessible from the outside of the cell such that the search could have been viewed by others had someone lifted the shade. (Dkt. Nos. 81 at 14; 81-8; 95 at 5-6). There is no evidence, however, of any lifting the shade or attempting to lift the shade during the search. It is undisputed that Defendant Brown was the only person who witnessed the strip search. The Court finds that the location of the search weighs in favor of reasonableness because the search was conducted outside the view of any other persons by a member of the same sex.

### iv.    Weighing the Factors

Based on the analysis of the *Bell* factors above, the Court finds that the justification, scope and manner, and location of the search weighs in favor of reasonableness. Accordingly, the Court

finds that the search was reasonable and Defendant Brown did not violate Plaintiff's Fourth Amendment rights in conducting the search.

### b. Qualified Immunity Analysis

When evaluating a qualified immunity defense, the Court must determine (1) whether the facts alleged, taken in the light most favorable to the plaintiff, show that defendants' conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). The two prongs of the qualified immunity analysis may be addressed in whatever order is appropriate given the circumstances of the particular case. *Id.* at 236.

The second prong of the qualified immunity analysis asks whether the right in question was clearly established at the time of the Defendant's actions. *Id.* at 232. "'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 583 U.S. 48, 138 (2018). "To be clearly established, a legal principle must have sufficient clear foundation in then-existing precedent. The rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority." *Id.* Although the law does not require that there be a prior case identical to the case at bar for the law to be clearly established, *see Hope v. Pelzer*, 536 U.S. 730, 741 (2002), "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

Based on the Supreme Court's decision in *Florence*, the Court finds that the law regarding the constitutionality of strip searches and visual body cavity searches in detention settings,

particularly those conducted under circumstances similar to the Plaintiff's, was not sufficiently clear at the time of the incident.

In *Florence*, the plaintiff was arrested on a bench warrant stemming from his failure to appear at a hearing to enforce a fine. *Florence*, 566 U.S. at 323. During intake processing, "prior to [his] admission to the general population" in two different facilities, he was subjected to searches that required him to, inter alia, "lift his genitals, turn around, and cough in a squatting position." *Id.* at 324-25. "This policy applied regardless of the circumstances of the arrest, the suspected offense, or the detainee's behavior, demeanor, or criminal history." *Id.* at 324. After the strip search at the second facility, the plaintiff was admitted to the general population and "released the next day, when the charges against him were dismissed." *Id.* The Supreme Court held that the jails' policies, which permitted strip searches during the intake process—even without reasonable suspicion of concealed contraband—did not violate inmates' constitutional rights. *Id.* at 339.

In applying *Florence*, we must remember (1) that Florence was arrested on a bench warrant, and (2) that the Court recognized that judicial deference to strip searches might well lessen in other circumstances. In light of these factors, the Court recognized that *Florence* extends only so far. For instance, in Part IV of the opinion (joined by three other Justices), Justice Kennedy identified possible future exceptions from the Court's ruling. *Id.* at 338–39. First, he acknowledged that "[t]his case does not require the Court to rule on the types of searches that would be reasonable in instances where, for example, a detainee will be held without assignment to the general jail population and without substantial contact with other detainees." *Id.* After doing so, he identified a possible two-part exception from *Florence*'s general rule concerning "whether an arrestee whose detention has not yet been reviewed by a magistrate or other judicial officer, and who can be held in available facilities removed from the general population, may be subjected to the types of

14

searches at issue here." *See id* at 339. Second, he noted that "there also may be legitimate concerns about the invasiveness of searches that involve the touching of detainees," but he explained that Florence had raised no such issues. *Id.* at 325, 339.

Two of the majority's five Justices filed concurring opinions addressing the reach of the Court's holding. First, Chief Justice Roberts noted that "it is important for me that the Court does not foreclose the possibility of an exception to the rule it announces." *Id.* at 340, (Roberts, C.J., concurring). He limited *Florence* to its circumstances—"the facts that Florence was detained not for a minor traffic offense but instead pursuant to a warrant for his arrest, and that there was apparently no alternative, if Florence were to be detained, to holding him in the general jail population." *Id.* To avoid "embarrass[ing] the future," Chief Justice Roberts noted that the Court was "wise to leave open the possibility of exceptions." *Id.*

Second, Justice Alito considered it important "that the Court does not hold that it is *always* reasonable to conduct a full strip search of an arrestee whose detention has not been reviewed by a judicial officer and who could be held in available facilities apart from the general population." *Id.* at 341 (Alito, J., concurring). He then emphasized that "[t]he Court does not address whether it is always reasonable, without regard to the offense or the reason for detention, to strip search an arrestee before the arrestee's detention has been reviewed by a judicial officer." *Id.* at 342. He singled out arrestees who are likely to be released by a magistrate on their own recognizance or on minimal bail, and declared that it might not be reasonable to admit them "to the general jail population, with the concomitant humiliation of a strip search," "particularly if an alternative procedure is feasible." *Id.* at 341–42.

The *Florence* plurality explicitly stated, in three different opinions, that whether it is reasonable to strip search an arrestee who does not enter a jail's general population is an open

question. The open questions identified by the plurality opinion and the concurrences encompass the facts of the case here.

In addition to *Florence*, the Court's review of Fourth Circuit cases *Cantley v. W. Virginia Reg'l Jail & Corr. Facility Auth.*, 771 F.3d 201, 205 (4th Cir. 2014) and *West v. Murphy*, 771 F.3d 209 (4th Cir. 2014) confirms that the constitutionality of strip searches and visual body cavity searches in detention settings conducted under circumstances similar to the Plaintiff's was not sufficiently clear at the time of the incident. In *Cantley*, the Fourth Circuit found that officers were entitled to qualified immunity from a Fourth Amendment claim when a pre-arraignment arrestee, who was arrested for obstructing an officer and putting debris in the road, was strip searched in a private room before being placed in a holding cell outside of the general population with one other arrestee. *Cantley*, 771 F.3d at 204-07. In *West*, the Fourt Circuit found that officers were entitled to qualified immunity from a Fourth Amendment claim when arrestees were strip searched in a private room during a booking process that resulted in multiple arrestees being held in holding rooms together. *West*, 771 F.3d at 215-216. In both *Cantley* and *West*, the Fourth Circuit found that the law was not clearly established. *Id.* at 216; *Cantley*, 771 F.3d at 206.

Thus, even assuming the Plaintiff's constitutional rights were infringed upon, it was not clearly established that conducting a visual body cavity search in these circumstances—prior to placing a detainee in a cell with other women—would constitute a violation of the Fourth Amendment. As such, a reasonable officer in Defendant Brown's position could have believed that the search was lawful.

### 2. Defendant Baldwin's Alleged Fourth Amendment Violation

Plaintiff contends that Defendant Baldwin, Plaintiff's booking officer, is liable based on the doctrine of bystander liability because Defendant Baldwin did not intervene when Defendant

16

Brown searched Plaintiff in the holding cell. Defendants did not specifically object to this portion of the R & R.

"Bystander liability is premised on an officer's affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers." *Johnson*, 105 F.4th at 123-24. An officer may be liable under § 1983 if she "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Id.* at 124. "The bystanding officer must know of h[er] fellow officer's misconduct. If the bystander lacks such specific knowledge, [s]he cannot be a participate in the unlawful acts, and the imposition of personal liability is impermissible." *Id.*

Even assuming that Defendant Brown violated Plaintiff's clearly established constitutional rights, the Magistrate Judge found that Plaintiff failed to provide evidence sufficient to prove Defendant Baldwin knew or should have known that Defendant Brown was engaged in an unconstitutional search. The Magistrate Judge correctly noted that the evidence only showed that Defendant Baldwin knew Defendant Brown was conducting a strip search and that the evidence did not support a finding that Defendant Baldwin was aware or should have been aware of the scope of the search or that the search expanded to include a visual body cavity search. Accordingly, the Court adopts this portion of the R & R and grants summary judgment in favor of Defendant Baldwin on Plaintiff's bystander liability claim.

### 3. Defendants Brown and Baldwin's Alleged Fourteenth Amendment Violation

The Equal Protection Claus of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the law." U.S. Const. amend. XIV, § 1. The clause requires that similarly-situated individuals be treated alike. *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008) (citing *City of Cleburne v. Cleburne Living Ctr., Inc.*,

17

473 U.S. 432, 439 (1985)). "To succeed on an equal protection claim, a plaintiff must first demonstrate that [s]he has been treated differently from others with whom [s]he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). "Once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Id.*

Plaintiff argued that the strip search violated the Equal Protection clause of the Fourteenth Amendment because she believes that men are not routinely strip searched nor forced to undergo visual or actual body cavity searches in the same manner that women are.

The Magistrate Judge found that the Plaintiff's equal protection claim against Defendants Brown and Baldwin lacked merit, concluding that the Plaintiff failed to demonstrate that Defendants treated her differently from similarly situated individuals based on gender. The Magistrate Judge found that Plaintiff did not provide any evidence, statistical or otherwise, to show that men who are strip searched are treated differently than women who are strip searched at the detention center. The Magistrate Judge further noted that these claims were alleged only against Defendants Brown and Baldwin and that there was no evidence showing that Defendants Brown and Baldwin treated male detainees more favorably under similar circumstances. As a result, the Magistrate Judge recommended granting summary judgment in favor of Defendants Brown and Baldwin on the Plaintiff's equal protection claim.

Plaintiff did not specifically respond to the Magistrate Judge's recommendation in her objection. Plaintiff only argued that the manner in which women are required to remove their menstruation devices, meaning naked and with their legs spread on a toilet in front of correctional officers, violates equal protection because males are not required to undergo the same humiliating

18

procedure. Plaintiff did not point to any evidence showing either Defendant Brown or Baldwin treated detainees differently based on their gender.

Accordingly, the Court overrules Plaintiff's nonspecific objections on this issue and grants summary judgment in favor of Defendants Brown and Baldwin.

### B. Motion filed by Defendants Knight, Darling, Branch, and Taylor

Plaintiff brought claims against Defendants Knight, Darling, Branch, and Tylor under § 1983 alleging that they were responsible for the violation of her constitutional rights due to their supervisory roles and involvement in the policies at the detention center. Specifically, Plaintiff asserted that these defendants either participated in, were aware of, or failed to prevent the unlawful search conducted by Defendant Brown.

The Magistrate Judge recommended granting the motion filed by these Defendants. For Defendants Taylor and Branch, the Magistrate Judge found that Plaintiff failed to provide sufficient evidence demonstrating personal involvement in the violations. For Defendants Darling and Knight, the Magistrate Judge concluded that there was no evidence of a widespread pattern of similar unconstitutional searches or misconduct at the detention center, nor was there any evidence of failing to train or supervise officers in a way that directly caused the alleged violation of Plaintiff's rights. The Magistrate Judge reasoned that without evidence of such a pattern of deliberate indifference Plaintiff's supervisory liability claims should be dismissed. Further, the Magistrate Judge noted that Plaintiff failed to establish a causal link between any policies or customs maintained by Defendants and the specific constitutional violations alleged. The Magistrate Judge reasoned that summary judgment is appropriate because Plaintiff's allegations were based on an isolated incident rather than systemic issues attributable to the supervisory Defendants.

Plaintiff did not specifically object to this portion of the Magistrate Judge's R & R. Accordingly, the Court reviews this portion of the R & R for clear error.

After a review of the R & R, the record, and the controlling law, the Court finds that the Magistrate Judge correctly and ably addressed Defendants Knight, Darling, Branch, and Taylor's motion for summary judgment and adopts this portion of the R & R. The Court therefore grants summary judgment in favor of Defendants Knight, Darling, Branch, and Taylor.

### C. Motion filed by DCSO

Plaintiff only brings state-law claims against DCSO. Specifically, Plaintiff brings claims pursuant to the South Carolina Tort Claims Act for reckless infliction of emotional distress and negligence/gross negligence. The Magistrate Judge recommends the Court decline to exercise supplemental jurisdiction over Plaintiff's state law claims and remand the claims against DCSO to state court.

Defendants object, arguing that the factors in considering whether to exercise supplemental jurisdiction all weigh in favor of exercising jurisdiction in this case. Specifically, Defendants argue that there is no need for the Court to analyze Plaintiff's reckless infliction of emotion distress claim because the South Carolina Supreme Court, in answering this Court's certified question, held that the bar to recovery for intentional infliction of emotional distress applies to the subset of claims for the reckless infliction of emotional distress. Additionally, Defendants argue that the gross negligence cause of action has already been fully briefed and does not require any specialized knowledge from the court that would be better handled by a state court judge.  Accordingly, the Court conducts a *de novo* review on this issue.

"The doctrine of supplemental jurisdiction indicates that federal courts generally have discretion to retain or dismiss state law claims when the federal basis for an action drops away."

20

*Shanaghan v. Cahill*, 58 F.3d 106, 109 (4th Cir. 1995). A court declining to exercise supplemental jurisdiction has "inherent power to dismiss the case or, in cases removed from State court, to remand, provided the conditions set forth in § 1367(c) for declining to exercise supplemental jurisdiction have been met." *Hinson v. Norwest Fin. S.C., Inc.*, 239 F.3d 611, 617 (4th Cir. 2001). Pursuant to § 1367(c), a district court may decline to exercise supplemental jurisdiction over a claim if:

> (1) the claim raises a novel complex issue of State law, (2) the claim substantially predominates over the claim or claims which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

"Although a federal court has discretion to assert [supplemental] jurisdiction over state claims even when no federal claims remain, ' . . . if the federal claims are dismissed before trial . . . the state claims should be dismissed' without prejudice." *Alexandria Resident Council, Inc., v. Alexandria Redev. & Hous. Auth.*, 11 F. App'x 283, 287 (2001) (internal citations and alteration omitted) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)). This is so because "[w]hen all federal claims are dismissed early in the litigation, the justifications behind [supplemental] jurisdiction—considerations of judicial economy, convenience and fairness to litigants'—are typically absent." *Id.* (quoting *Gibbs*, 383 U.S. at 726, 86 S.Ct. 1130.)

Application of the § 1367(c) factors to this case supports remand. The Court's review of DCSO's motion for summary judgment reveals complex questions better suited for state court, including whether DCSO is entitled to protection under the South Carolina Tort Claims Act. Therefore, even at this late stage, the Court declines to exercise supplemental jurisdiction over

Plaintiff's state law claims. The Court remands the remaining state law claims against DCSO to the state court where Plaintiff originally filed this action.

**IV.    Conclusion**

For the reasons set forth above, the Court **GRANTS** Defendants Brown and Baldwin's and Defendants Taylor, Branch, Knight, and Darling's motions for summary judgment (Dkt. Nos. 78 and 79). The Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims and **REMANDS** Plaintiff's state law claims and DCSO's motion for summary judgment (Dkt. No. 80) to the Dorchester County Court of Common Pleas.

　s/Richard Mark Gergel　　
Richard Mark Gergel
United States District Judge

September 11, 2024
Charleston, South Carolina